Deborah A. COBE et al.

v.

Sean W. HERSEY et al.

Wayne MANSON

v.

Sean W. HERSEY et al.

No. 89–79–A.

Supreme Court of Rhode Island.

June 27, 1990.

Shayle Robinson, Cranston, for Cobe.

Thomas H. Quinn, Jr., Providence, for Manson.

Louis J. Saccoccia, West Warwick, for Manson.

Paul V. Reynolds, James McGair, Providence, for Hersey.

Orlando Andreoni, Providence, for Harrison.

Dennis J. Roberts, II, Providence, for Metropolitan Ins.

## OPINION

FAY, Chief Justice.

This matter comes before the Supreme Court on appeals from the judgments in two consolidated civil actions that arose out of an early-morning collision between a motorcycle and an automobile. The jury returned verdicts for both plaintiffs and apportioned liability between the operators of the two motor vehicles. The operators of the vehicles have appealed. The facts relevant to the appeals are as follows.

The accident, which occurred at approximately 1 a.m. on June 15, 1980, involved a motorcycle operated by Wayne Manson (Manson), upon which David Cobe was a passenger, and an automobile operated by Sean W. Hersey, in which Frederick Day was a passenger.

The two vehicles collided on Pontiac Avenue in Cranston, Rhode Island, at a point where the road crosses over Route 10, curving to the left headed northbound and to the right headed southbound. At the time of the accident Manson was operating the motorcycle, owned by Annette F. Harrison, in a southerly direction; Sean Hersey was operating the automobile, owned by his mother, Bridie M. Hersey, in a northerly direction. As a result of the accident David Cobe was killed and Manson was severely injured.

On May 23, 1982, plaintiff Deborah A. Cobe, individually and in her capacity as administratrix of the estate of David W. Cobe, filed a complaint in Providence Coun-

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

ty Superior Court against defendants Sean Hersey, Bridie Hersey, Annette Harrison, Wayne Manson, and Metropolitan Property and Liability Insurance Company. In this action defendant Manson filed a cross-claim against defendants Sean and Bridie Hersey. In a separate action plaintiff Wayne Manson filed suit against defendants Sean Hersey, Bridie Hersey, Annette Harrison, and Deborah Cobe in her capacity as administratrix of the estate of David W. Cobe.[1] The two cases were subsequently consolidated for trial.

A jury trial was held in the Superior Court from March 3 to 24, 1988. At trial Police Officer Michael Chalek testified that he was called to the scene of the accident at approximately 1 a.m. He was the first police officer to arrive at the scene. He observed two people, later identified as David Cobe and Wayne Manson, lying face down on the roadway in the southbound lane of Pontiac Avenue. A motorcycle was lying in the southbound lane against the curbing, and a 1978 Chevrolet Camaro was stopped in the northbound lane. The motorcycle was "pretty banged up" and the car had "extensive damage to the left front section, and the tire had been knocked off the vehicle, and it was dragged or caught underneath the car."

Officer Chalek accompanied Sergeant Ronald Guilmette in investigating the scene. Photographs and measurements were taken and a diagram of the scene was prepared.[2] Officer Chalek described seeing a gouge mark, as well as some debris and liquid, which he believed was from the vehicles, several feet into the northbound lane. He also observed a "fresh scrape mark," which originated behind the brake drum of the Hersey vehicle[3] and ran "across Pontiac Avenue to the west side curbing (southbound lane). Then back across the center line back into the northbound lane." The point at which the scrape mark ended was the point in the northbound lane where he had observed the debris.

Relying upon his observations, Officer Chalek made a determination concerning the point of impact of the vehicles. The trial justice refused to let him testify concerning his determination, however, apparently because she did not believe that he was qualified to render an opinion.[4]

Deborah Cobe testified that David Cobe and Wayne Manson left her house to go out to a club shortly before 1 a.m. on the day of the accident. She said that the two men had each had two drinks of Scotch before they left.

Officer Richard Falcone testified that the medical examiner's report on David Cobe indicated that Cobe had a blood-alcohol level of 0.13 at the time of his death. Officer Falcone stated that a breathalyzer test he performed on Sean Hersey after the accident revealed a blood-alcohol level of 0.10 at 2:15 a.m. The hospital report for Wayne Manson indicated that he had a blood-alcohol level of 0.248 at the time of his admittance.

Dr. John DeFeo, a retired professor of pharmacology, testified concerning the effect of various blood-alcohol levels upon an individual's motor skills.

"At .10 level, I have seen and I have observed this because it's a critical point that a person is mentally able to discern what's going on. Usually, these people do not look as though they are under the influence of alcohol. They are mentally

1. The claim against Metropolitan Property and Liability Insurance Company was settled prior to trial. Verdicts were directed for defendants Annette Harrison and Deborah A. Cobe, in her capacity as administratrix of the estate of David W. Cobe. Appeals were not taken from the directed verdicts.

2. *The photographs were introduced into evidence at trial. The diagram was held inadmissible, however, because it contained conclusions concerning the point of impact.*

3. A portion of this scrape mark was evident in one of the police photographs introduced into evidence (plaintiffs' exhibit No. M 9).

4. It is apparent from the transcript that the trial justice was concerned about the basis of Officer Chalek's determination. Officer Chalek based his opinion in part on the debris he observed in the northbound lane. The trial justice expressed doubt concerning Officer Chalek's ability to connect this debris to this particular accident with absolute certainty.

capable of some reasoning, making decisions, and probably would be capable of driving a car if they drove at a moderate slower speed and stayed away from having to make any sudden reactionary decisions. They do know what they feel like."

When asked about the effects of a blood-alcohol level of 0.248, he stated:

"Well, point 248 is a very high level of blood alcohol. There is no question about it. When you start getting above point 15 percent, people are intoxicated and under the influence. Point 248 would be a severe intoxication and heavily under the influence of alcohol. Under these conditions, the body's ability to reason would be impaired, to make judgments would be impaired, the muscle activity, that is the ability of the body to move in coordinated fashion, as you need, for instance, to apply the brakes would be impaired; eyesight is very often above point 20 so the person does not see very clearly and sometimes has double vision so all in all, a person under the influence of this much alcohol would be very severely impaired in attempting to operate a mechanical device such as an automobile or motor cycle or what have you.

"Q What affect would a blood alcohol level of point 248 have on the judgment of that individual?

"A It would be severely impaired. Once again, as long as he wasn't unconscious some people at that high level would begin to become unconscious. He would probably be aware of what where he was and so forth but could not make proper judgments and, obviously, could not make sudden reactions at all."

Wayne Manson testified that he had no recollection of the events surrounding the accident.

"Q What is the last thing you remember on that night?

"A The last thing I remember was I was talking to David about the trip they had gone to in Boston.

" * * *

"Q What's the next thing you remember?

"A I woke up in a hospital, and I was on a stretcher, and there was—I don't know if it was the doctor or who it was, they informed me I was in a motor cycle accident. They told me they may have to amputate my leg and to sign my name. They would need my signature in order to do so; and if I couldn't sign my name, just to makes [*sic*] an X, and I just—I just scribbled out my name."

Sean Hersey testified that at the time of the accident he was driving a car belonging to his mother, Bridie Hersey, and was accompanied by a friend, Frederick Day. The two men were returning home, having spent the majority of the evening at the Seekonk Speedway where they had consumed four or five beers apiece.[5] Hersey stated that following the initial impact, something struck the windshield above his head and veered off to the left.

Hersey testified that at the point of impact he was driving in the middle of his lane "approximately three or four feet from the yellow line." After impact the left front of the car "dropped down" and the car began to pull to the left. He also stated that upon surveying the accident scene shortly after the police arrived, he observed a freshly made gouge mark in the road in the northbound lane in the area where he believed the accident had occurred. Hersey identified this gouge mark in photographs that were introduced into evidence.

On cross-examination Hersey stated that he also observed something on the road, not necessarily a gouge mark, but a visible path that led from the gouge mark identified in the photographs across to the left curb (the southbound lane) and back across to the corner of Brookside Drive (the northbound lane). This path was not visible in

**5.** Hersey testified that he had his last beer just prior to leaving the Seekonk Speedway, which was approximately at 11:30 or 11:45 p.m.

any of the photographs introduced into evidence.

Frederick Day testified that he was "positive" that Hersey was operating in the northbound lane, about one or two feet from the yellow dividing line, when the collision occurred. Following the collision the Hersey vehicle "slumped down" on the left-hand side and veered to the left, traveling across Pontiac Avenue and striking the curb in the southbound lane. The car then traveled back across to the northbound lane, coming to rest at the foot of Brookside Drive.

The plaintiffs presented Dr. Yau Wu as an expert witness. Dr. Wu stated that he is the president of the consulting firm of Dynamics Analysis Corporation, which specializes in accident reconstruction. He holds master's degrees in theoretical and applied mechanics and mechanical engineering as well as a Ph.D. in economics and astronomics. He visited the accident scene in April 1984 and also observed photographs of the scene and of the vehicles involved. He testified that in determining the point of impact of the vehicles, he took into consideration

"the rest positions of the two persons (Cobe and Manson) and both rest on the curb—close to the curb in the southern directions. Also, the rest position of the motorcycle and, also, the path of the motorcycle after the collision, the scrape mark of the motorcycle on the surface on the road, and the paths of the vehicles, and to its left, and then finally rests to its right, and the total distance from the approximate area of impact to the rest positions, and based on this evidence, and also, the physical principle of the trajectory of the person as being thrown from the motorcycle.[6]"

Nevertheless Dr. Wu stated that he was unaware of the scrape mark observed in the northbound lane by Officer Chalek. He did not consider this scrape mark in reaching his determination concerning the point of impact.

Dr. Wu testified concerning the point of impact as follows:

"Q. Based on a reasonable degree of scientific certainty and based upon your observations and all the hypotheticals I gave you where were the points of impact?

"A. Okay. The point of impact is close to center line, but in south of the center line. This is proximate point of impacts. Most probable, I would not say a hundred percent, but most probable is in this area at this point [the southbound lane]."

On cross-examination the doctor answered as follows:

"Q. You would admit the [sic] this accident could have occurred between the motorcycle and the automobile three foot six inches from the center line of Pontiac Avenue in the northbound lane, would you not, you would admit that's possible?

"A. I would not say the exact point that three feet, but I would say that it's possible that is on the northbound lane but most probably on southbound lane. This is my conclusion."

The Herseys offered Dr. Donald Avery as an expert witness. Doctor Avery is a professor of engineering at Brown University with a background in accident reconstruction. He visited the accident scene approximately one month after the accident as well as a few months prior to trial. On his first visit he operated a motorcycle up and down Pontiac Avenue (approximately thirty-three times each way) at varying speeds. He noted that at speeds of thirty-five to forty miles per hour he began feeling uncomfortable with the cornering ability of the motorcycle and therefore he did not operate in excess of this speed.

Taking into account the curvature of the roadway, the damage done to the vehicles, the positions of the vehicles after the accident, the rest position of the bodies, and the gouge mark in the northbound lane, Dr. Avery concluded that the point of impact occurred four to eight feet south of the

---

6. The scrape mark was evident in three of the police photographs introduced into evidence (plaintiffs' exhibit Nos. M 8, M 11, and M 12).

It was located in the southbound lane near the point of rest of the motorcycle.

gouge mark (in the northbound lane). He stated that it was his belief that the gouge mark was caused by the left front brake drum of the Hersey vehicle, which struck the pavement after the wheel was torn off. He stated that when the brake drum first struck the pavement, it would produce a drag mark in the pavement. As the car began to turn left, the weight would shift in the car and "the drag mark would become reduced and lift off the roadway."

There was also a great deal of testimony from Wayne Manson's past and present treating physicians about the severe and permanent injuries he sustained as a result of the accident. He has lost almost all feeling and most mobility in his left lower leg, the leg is several inches shorter than the other one, and he suffers from poor circulation and chronic foot ulcers. Although several physicians had repeatedly recommended that Manson undergo amputation of the lower portion of the leg, he steadfastly refused that option.

At the close of the evidence the trial justice instructed the jury on the legal principles of comparative negligence and proximate cause. The trial justice stated that if the jury determined that an award of damages was mandated, it could consider medical expenses, lost wages, conscious pain and suffering, burial and funeral expenses, and loss of consortium in computing an appropriate award.

The jury found both Sean Hersey and Wayne Manson negligent. They allocated 67 percent of the negligence to Hersey and 33 percent to Manson. The jury found total damages for Manson in the amount of $569,426 and awarded damages to Deborah Cobe for funeral expenses in the amount of $3,272, pecuniary loss to the estate in the amount of $419,000, and loss of consortium in the amount of $465,000. The Herseys subsequently filed a motion for a new trial. Said motion was denied on June 13, 1988, and on June 24, 1988, the Herseys filed a notice of appeal. Wayne Manson filed a notice of appeal on June 30, 1988.

On appeal the Herseys argue that numerous errors committed by the trial justice warrant the granting of a new trial.

The defendant Manson, however, does not challenge any ruling of the trial justice except her instruction concerning loss of consortium. The plaintiff Cobe, on the other hand, urges this court to affirm the judgments and to uphold the trial justice's denial of the Herseys' new-trial motion. We shall first address the loss-of-consortium issue.

■ The trial justice instructed the jury that if it found that plaintiff Deborah Cobe had suffered the loss of her late husband's love, society, affection, and companionship as a result of the negligence of Sean Hersey or Wayne Manson or both, it could award her a fair and adequate sum representing compensation for such loss of consortium. We believe that the trial justice was clearly in error in so charging the jury because on the date of David Cobe's death, June 15, 1980, the Rhode Island Wrongful Death Statute (G.L.1956 (1969 Reenactment) §§ 10–7–1 through 10–7–13) did not provide a remedy for spousal loss of consortium.

In 1982 the Legislature amended the Wrongful Death Statute by adding § 10–7–1.2, thereby allowing unemancipated minors to recover damages for the loss of society and companionship of a parent. P.L.1982, ch. 217, § 1. In 1984 the Legislature amended § 10–7–1.2 to allow recovery for loss of consortium on the part of a spouse and on the part of a parent of an unemancipated minor. P.L.1984, ch. 64, § 2. Section 3 of P.L.1984, ch. 64, provides that the act shall take effect upon passage (May 2, 1984) and shall apply to all causes of action accruing after the effective date of passage. It is evident from this language that that portion of the amendment allowing recovery for spousal loss of consortium was intended to be applied prospectively rather than retroactively. It was therefore improper for the trial justice to apply this amendment to a cause of action that accrued in June 1980, four years prior to the effective date of the amendment.

In arguing for a new trial, the Herseys allege that numerous errors were committed by the trial justice. We are convinced that one of these charged errors mandates

the granting of a new trial, and therefore, we shall limit our review to this area.

The Herseys allege that the trial justice erred in excluding the opinion testimony of Officer Michael Chalek concerning the point of impact of the two vehicles. We are persuaded by this argument because we believe that Officer Chalek was sufficiently competent to be qualified as an expert witness for the purpose of rendering such opinion testimony.

 Determinations by trial justices regarding the competency of expert witnesses have traditionally been afforded great latitude. The test of qualification as an expert witness lies in the sound discretion of the trial justice, and his or her determination in this regard will not be disturbed in the absence of clear error or abuse. *Lacey v. Edgewood Home Builders, Inc.*, 446 A.2d 1017, 1018 (R.I.1982); *Municipal Court of Providence v. Kirby*, 28 R.I. 287, 288, 67 A. 8, 9 (1907). Nonetheless, despite the deference of this standard of review, we are of the opinion that there was an abuse of discretion in this case.

On the date of the accident Officer Chalek had been a member of the Cranston police force for over two years. Prior to his appointment, he had received accident-investigation training at both the city police training academy and the municipal police-training academy, a portion of which involved determining the point of impact of vehicles involved in an accident. He utilized this training in investigating accidents prior to June 15, 1980.

Officer Chalek spent approximately two and one-half hours investigating the scene of the accident in question. During the course of his investigation, he observed gouges in the roadway as well as liquid and pieces of debris that had fallen onto the road. Relying on these observations, he formed an opinion concerning the point of impact.

 The trial justice refused to allow Officer Chalek to state his opinion, however, apparently because she was concerned about his ability to connect the debris to the vehicles involved with absolute certainty. We do not believe that this was a valid reason for excluding the testimony. This factor should have gone to the weight of the testimony, not to its admissibility.

We believe that Officer Chalek's training and experience, combined with his first-hand observation of the accident scene, provided a sufficient foundation to qualify him as an expert witness for the purpose of rendering an opinion on the point of impact.[7] The plaintiffs would have had ample opportunity to question Officer Chalek in order to raise doubts about the basis of this opinion, including his possible uncertainty about the origin of the debris. Having heard Officer Chalek's opinion testimony, the jury would have been called upon to weigh that testimony and accept or reject it in the same manner as all other evidence in the case.[8]

 Because of the significance of the excluded testimony, we believe that the trial justice's error warrants the granting of a new trial. Officer Chalek was prepared to testify that it was his opinion that the point of impact occurred in the northbound lane. Since the trial justice excluded this testimony, the jury essentially was left to determine the point of impact by choosing between the theories of the paid experts, Dr. Wu and Dr. Avery, two witnesses whose appearance at trial was occasioned by their ability to reach conclusions favorable to the parties who retained them.

---

7. Our decision is in line with those of courts in other jurisdictions that have permitted police officers trained and experienced in accident investigations to qualify as experts and give opinion testimony about the point of impact based on physical evidence observed, such as marks on the highway and location of debris. *See Randazzo v. Pitcher*, 17 Conn.App. 471, 553 A.2d 1158 (1989); *Szewczyk v. Doubet*, 354 A.2d 426 (Del.1976).

8. It is important to remember that the debris was only one element that Officer Chalek considered in forming his opinion. Of greater significance, it would seem, was the scrape mark that he traced from the rear of the brake drum of the Hersey vehicle to that point in the northbound lane where he had observed a concentration of debris and a fresh gouge mark.

We do not mean to minimize the value of expert testimony; nonetheless, we believe that such testimony must be viewed in light of its inherent biases. Officer Chalek's testimony was crucial, therefore, not only because of its potential impact on the jury's verdict but also because it constituted the only truly impartial opinion testimony concerning the point of impact. The jury should have been allowed to consider this testimony in reaching its verdict.

For the foregoing reasons the defendants' appeal is sustained, the judgment appealed from is vacated, and the papers of this case are remanded to the Superior Court for a new trial.