[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This is a civil action in which the plaintiff appeals from a decision of the Director of the Department of Environmental Management (hereinafter "DEM") to deny its application to construct and operate a hazardous waste incinerator. The plaintiff's application was heard and considered at length by a hearing officer who rendered a Recommended Final Decision on June 4, 1990. Thereafter, on July 16, 1990 the designated Director adopted the Recommended Final Decision as the Final Decision.
The Director has appeared by counsel and has requested that the plaintiff's appeal be denied and dismissed. The Director also claims that this Court does not have jurisdiction of this appeal. The City of Warwick, which appeared as an intervenor to object to the plaintiff's application at the public hearings in this matter, was granted leave by the Court to intervene in this action to oppose the plaintiff's appeal. The departmental record was certified to this Court on November 8, 1990. All parties filed briefs and reply briefs as of April 9, 1991. The matter was assigned for decision to this Justice on September 16, 1991. On March 17, 1992 the plaintiff moved for leave to be heard in oral argument. The motion was granted and the parties were heard by the Court on April 16, 1992.
This Court takes jurisdiction under G.L. 1956 (1988 Reenactment) § 42-35-15. After reading the entire record and considering the briefs and oral arguments this Court affirms the Director's Final Decision for the reasons which follow.
I.
Attorney/Client Privilege
The applicant first applied to DEM for a permit to operate a hazardous waste incinerator on November 6, 1986. DEM and the United States Environmental Protection Agency jointly reviewed the application. In response to their comments the applicant submitted a revised application on June 4, 1987. Without having completed its review of the revised application, DEM on June 29, 1987 scheduled a public hearing to be held on August 26, 1987 in the Warwick City Council Chambers. In the notice of hearing DEM said that it had not yet completed its review of the application, but it affirmed that it intended to do so before the hearing. The initial public hearing was continued twice and commenced on January 27, 1988. In the meantime the applicant once again on October 13, 1987 revised its application. It was this last revised application which was considered by the hearing officer, and which was ultimately denied by the designated Director.
On December 22, 1987 Mr. Terrance D. Gray, on DEM letterhead, wrote to the applicant that the application "meets the substantive requirements" of departmental rules and regulations pertaining to applications for hazardous waste permits. He went on to advise, nevertheless, that, "The Department (obviously meaning the staff) has not finalized its position on whether to recommend approval or denial of the application as of this date." The staff of DEM's division of air and hazardous materials decided some time before the commencement of the hearings to oppose the application. The applicant was formally notified of the departmental staff's position on January 24, 1988.
Mr. Gray, who identified himself as the principal DEM staff reviewer of the application, testified at the hearing that the application failed to disclose enough information upon which to base a staff recommendation of approval to the Director. The hearing officer did not rely on any of these grounds advanced for denial by Mr. Gray or by counsel for DEM in her ultimate conclusion. She expressly rejected Mr. Gray's contention that the application should be denied because it failed to contain adequate specific detail. In essence, she ruled that the staff was estopped by its letter of December 22, 1987 from claiming that the application was not formally complete.
In course of Mr. Gray's testimony he referred to two conferences, in which he and other members of DEM staff participated and at which Mr. Robert Bendick, the department Director, as well as departmental counsel were present. One such conference occurred in July 1987 and the other in November 1987. At some time prior to the commencement of these hearings Mr. Bendick had recused himself from considering the application, because he had publicly expressed his opposition to the application without having considered its merits. He designated one of his assistants, Mr. Malcolm J. Grant, to make a final decision under § 23-19.1-10 as designated Director pursuant, presumably, to authority contained in § 42-17.1-2(h) or (w)(1).
Mr. Gray testified that the purpose and subject of the conferences were discussions of the department staff's legal position at the hearings on the application. When Mr. Gray was asked to tell the hearing officer what the respective conferees said, the witness claimed an attorney-client privilege, which was upheld by the hearing officer. The applicant moved that the witness be compelled to produce his notes of the conversation at those conferences. On an assertion of the same privilege by the witness, the hearing officer refused to order their production.
The applicant contends that it was improperly foreclosed from demonstrating that the staff review of its application prior to the public hearing was biased and prejudicial. It urges that the mere presence of counsel at the conferences did not render everything said by all participants a confidential privileged communication between an attorney and a client. The evidence that the applicant argues it might have elicited had it been permitted to compel answers to its questions on cross-examination and production of the witness' notes would have tended to prove that the Director, who had already admitted to bias, influenced the staff review.
Recognizing that § 42-35-15(g) permits the Court to set aside an agency decision only if substantial rights of an appellant have been prejudiced by administrative decisions affected by error of law, the applicant argues that the failure to permit it to explore putative misconduct during staff review of its application deprived it of a full and fair hearing. The applicant's argument is misplaced for two reasons.
First, the hearing was full in every sense of the word. The applicant was permitted, even encouraged to present every element of evidence in support of its application. The hearing officer carefully and thoroughly considered all the evidence in support of the application. The applicant, like all parties, was permitted to cross-examine witnesses presented by its opponents to the utmost extent contemplated by § 42-35-10(c). The hearing officer's conduct of the hearings set a high administrative standard for fairness. Not once in the course of the hearings did the applicant claim that the hearing officer was treating it unfairly. Even in its brief before this Court, the applicant points to no ruling which it deems to be the product of bias on the part of the hearing officer. Nor does it argue here that the hearing officer was herself influenced by the common public knowledge that the Director had opposed the approval of its application.
Second, the hearing officer did not base her decision on any of the grounds for denial asserted by the departmental staff. She expressly eschewed them. In her recommended final decision, as adopted by the designated Director, she recognized the patent unfairness of the staff's review of the application. She relied on none of the grounds urged by the staff for denial. To argue now that she did not accord the applicant a full and fair hearing seems itself to be unfair. The applicant could not have expected any more consideration, even if it had been able to show that the staff review of its application had been thoroughly tainted with bias and prejudice.
Accordingly, even though it is not clear from the record that the precise questions to which objection was sustained would have required the witness to breach a privilege by disclosing confidential communication between an attorney and a client, the exclusion of the evidence sought did not prejudice the applicant. The same is true with respect to the refusal by the hearing officer to compel the witness to produce his notes, assuming that the hearing officer was vested with such power. Put another way, if the rulings were errors of law, they were harmless, since they did not affect the ultimate decision.
II.
The Payment of Expenses
It is undisputed that the Director has rendered a bill for the amount of expenses incurred under § 23-19.1-14(b) which the applicant has neither paid nor requested an opportunity to be heard. The applicant argues that the charges are unreasonable and refuses to pay. The Director argues that the applicant's failure to pay his bill deprives this Court of jurisdiction to hear this appeal. The applicant appropriately points out that there is no statutory or common law prohibition against this Court taking jurisdiction under § 42-35-15. R.I. State Police Lodge No. 25v. State, 485 A.2d 1245, 1247 (R.I. 1984). The Court concludes that payment of charges under § 23-19.1-14(b) is not a jurisdictional limitation of its power under § 42-35-15 to review administrative decisions.
While § 23-19.1-14(b) is no bar to this Court's jurisdiction to review the final decision of the Director of DEM, it is plainly a bar to the relief the applicant seeks. The language of the statute is explicit. In plain language it says: "An application for a permit or a permit renewal shall not begranted until all charges are paid in full." In this caseall charges have not been paid in full." The Director cannot grant the application in issue. This Court cannot order the Director to do something expressly forbidden by law. There is no authority in the statute for granting a permit conditioned on a later payment of charges, nor can this Court construe the statute as permitting such a conditional granting of a permit in the face of the plain language of the statute.
Accordingly, whether the designated Director was right or wrong when he denied the application on its merits, this Court will not order the present Director to grant the application, because the statutory charges have not been timely paid or appealed from as provided by the statute.
III.
The Factual Basis for Denial
After a protracted public hearing, the hearing officer in this case recommended that the Director deny the plaintiff's application because the plaintiff had failed to satisfy its burden of proof that the operation of the proposed facility would comply with the rules and regulations promulgated by the Director under § 23-19.1-6(a). The hearing officer ruled without objection that the applicant's burden was proof by a fair preponderance of the credible evidence. The pertinent rules and regulations areRules and Regulations for Hazardous Waste Generation,Transportation, Treatment, Storage and Disposal, (hereinafter "the Rules and Regulations") as amended through September 24, 1987. Rules 8.01 through 8.04, inclusive, set out in some detail the general requirements for all applications for permits under G.L. 1956 (1989 Reenactment) §§ 23-19.1-1, et seq. (hereinafter "the Act").
Judicial review by this Court of the factual basis for the decision of the Director is strictly limited to a search of the record to see if the reliable and probative evidence in the record supports his findings of fact and whether such evidence and facts form a reasonable basis for his conclusion. The court will not independently weigh the evidence nor substitute its fact-finding for that of the agency. St. Pius X Parish Corp. v.Murray, 557 A.2d 1214, 1218 (R.I. 1989); Costa v. Registrar ofMotor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988).
A.
The Drum Storage Area
40 C.F.R. 264.176
Rule 8.04U.4. requires a plan showing:
 "Where flammable or reactive wastes are stored, a description of procedures used to ensure compliance with 40 C.F.R. 264.176, as is or as amended."
Section 264.176 of Title 40 of the Code of Federal Regulations thereby incorporated in the Rules and Regulations reads as follows:
 "Containers holding ignitable or reactive waste must be located at least 15 meters (50 feet) from the facility's property line."
"Flammable waste" is not defined in the Act or in the Rules and Regulations. 40 C.F.R. § 261.21(a)(1) describes "ignitable waste" generally as including a liquid waste, other than certain alcohol solutions, which has a flash point less than 140° Fahrenheit. The evidence from all witnesses claiming any expertise regarding Rhode Island fire safety codes is that in Rhode Island a liquid is regarded as "flammable" if its flash point is 200° Fahrenheit or less. The hearing officer correctly concluded that the intent of Rule 8.04U.4. was to equate Rhode Island "flammable" with Federal "ignitable", so that the distance prescribed in40 C.F.R. § 264.176 applies to flammable liquid containers in Rhode Island.
The hearing officer found as a matter of fact:
 "The applicant has failed to prove that all containers holding ignitable or reactive waste will be located at least 15 meters (50 feet) from the facilities property line pursuant to 40 C.F.R. § 264.176."
 Recommended Final Decision, p. 94.
She based this finding on evidence which she found showed that:
 "Portions of Storage Area 4 are within 50 feet from the facility's property line.
 Ignitable and reactive wastes will be located in Storage Area 4 on a temporary basis and in the Flammable Liquids Room." Id., p. 92.
Rule 8048. requires the applicant to furnish the Director with:
 "A site plan drawn to a minimum scale of one inch equals one hundred feet (1"=100') showing the following:
 1. On site
 All structures Location of operational units Access control
 2. Within 500 feet of the perimeter of the facility:
 All property lines All water lines
 * * *"
To meet part of that Rule the applicant furnished as part of its application "Site Plan C., Showing On-site Topography, Buildings, Treatment and Storage Areas and Property Lines at Fort Barton Ind." In the plan's legend an arabic numeral within a 5/16" diameter circle is shown to indicate a "Container Storage Area." A broken line intersected by the joined over-laid letters P and L are shown to indicate a "Property Line." The scale is shown to be one inch equals ten feet (1"=10'). Even a casual survey of the plan discloses that a substantial portion of Container Storage Area 4 lies within 50 feet or less from the eastern property line of the premises for which the applicant seeks its permit. During his testimony, the witness Barry A. Muller drew and initialed a line on the Site Plan approximately 50 feet from and parallel to the eastern property line of the applicant's premises.
The legend indicates that squares approximately 3/8" on a side represent 4' x 4' wooden pallets. According to the concept illustrated in Site Plan C, the applicant proposes to locate some 18 or 19 pallets, each of which is capable of holding four standard 55 gallon drums, within 50 feet of its property line.
In its application in Section 8.32 at page 8-10 the applicant says:
 "Storage Area 4 will be used for interim storage,
as well as long term storage. Containers will be moved from the trucks to this area for inspection and sampling, as described in Section 8.22 and the Waste Analysis Plan in Section 4.00." (Emphasis supplied.)
At page 8-9 of the same section the applicant plainly states that no flammables or reactives may be stored in other areas than Container Storage Areas 2 and 3. Nothing in the application forbids the locating of flammable liquid containers in any other area. In Section 8.22 at page 8-3 the applicant says:
 "Initially drums will be unloaded from the delivery truck and temporarily held in storage Area 4 for sampling and classification. These containers will be sampled within 48 hours of being received, as described in (the applicant's) Waste Analysis Plan, Section 4.00, then moved to their designated storage area. All containers of hazardous waste will be maintained closed during loading/unloading operations."
In describing the fire protection system proposed for the facility the applicant's fire protection expert, Mr. Orville Slye, testified that the same automatic foam/water sprinkler system would be used to suppress fires in Container Storage Area 4 as would be used in Container Storage Area 3, specifically designated as a flammable liquid storage area. The inference that the applicant proposed to locate "ignitable waste" in Container Storage Area 4 for up to 48 hours for any given delivery is inescapable.
There is no reason to construe "stored" in Rule 8.04U.4. any differently from "located" in the Federal Regulation. The hearing officer was justified in concluding that even the "temporary" location of containers constituted storage of those containers, even if only "interim" as stated by the applicant. Likewise, the applicant's argument that it designated this area as only a temporary holding area is not persuasive, because the temporary nature of the storage applies only to each delivery. In a stream of deliveries there might always be some ignitable waste stored in the area. Finally, the applicant's argument that Mr. Barry W. Muller's testimony referred only to the eastern wall of Container Storage Area 4 is belied by the line Mr. Muller drew and initialled well inside Container Storage Area 4.
Since it is abundantly clear from the evidence that the applicant will either violate 40 C.F.R. § 264.176 or has failed to provide the plan required by Rule 8.04U.4., the hearing officer's finding that the applicant failed to satisfy its burden of proof that its facility would comply with the Rules and Regulations is not clearly erroneous in view of the reliable, probative and substantial evidence on the whole record.
B.
40 C.F.R. § 264.31
The hearing officer found as a fact that:
 "The applicant has failed to prove that the proposed facility has been designed to be constructed and operated to minimize the possibility of a fire, explosion or any unplanned sudden release of hazardous waste constituents pursuant to 40 C.F.R. § 264.31."
 Id., p. 94.
Rule 9.07 reads as follows:
 "Flammable, Reactive or Incompatible Wastes: The owner or operator of the facility must take precautions to prevent the accidental ignition or reaction of flammable, reactive or incompatible wastes or materials equivalent to those in 40 C.F.R. 264.17 and Subpart C (which includes § 264.31), as are or as amended."
Rule 9.08 also provides:
 "Preparedness and Prevention: The facility owner or operator must comply with preparedness and prevention requirements equivalent to those in 40 CFR 264 Subpart C, as is or as amended."
40 C.F.R. § 31, as thereby incorporated in the Rules and Regulations, reads as follows:
 "Facilities must be designed, constructed, maintained, and operated to minimize the possibility of a fire, explosion, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment." (Emphasis supplied)
In order to reach the conclusion she did, the hearing officer rejected the conclusions of the only expert witness to whose testimony, on fire or explosion risks, she gave any weight. Mr. Orville Slye, Jr., presented exemplary credentials as an expert witness in the field of fire protection. He testified unequivocably that the facility would meet or exceed all pertinent National Fire protection Association (NFPA) standards.See, Transcript, July 18, 1989, p. 37. The hearing officer acknowledged these standards to be the functional equivalent of the standards implied in the language, "minimize the possibility of a fire (or) explosion" in 40 C.F.R. § 264.31. Even though the hearing officer rejected the witness' ultimate conclusions, as she was entitled to do as the ultimate fact-finder, Kyle v.Pawtucket Redevelopment Agency, 106 R.I. 670, 673, 262 A.2d 636, 637-8 (1970), she did accept some of his factual testimony.
1. The Flammable Storage Room
Mr. Slye testified about fourteen areas in the facility with which he associated particular fire risks. His fire area 5 is the same as Container Storage Area 3, identified as the Flammable Storage Room on Site Plan C. Concerning this area he testified:
 "Fire Area 5. Fire Area 5 is a flammable and combustible liquid, which is mostly flammable liquid, storage area which is designed in accordance with NFPA 30 requirement for a flammable liquid area storage area. The area is segregated from adjacent areas by fire wall. It is also protected by foam-water sprinkler protection system, open heads, actuated automatic heat detection which initiates the flow of the fire protection system. The area is separated from adjacent areas by a berm and has a blow-out panel wall on the south side in accordance with requirements of NFPA 30." Transcript, July 18, 1989, pp. 7-8. (Emphasis supplied)
The witness obviously mis-spoke himself when he referred to the berm, which would not be necessary, since this area is sealed off from adjacent areas by fire walls.
The concept of Container Storage Area 3 displayed in Site Plan C and described in Section 8.41 at pages 8-18 and 8-19 of the application is a room at least 50 feet from all property lines and designed in compliance with NFPA 30. One of the key requirements of NFPA 30 which the area will meet is that its size will be less than 500 square feet of floor area. The graphic representation on Site Plan C displays an interior room with an interior floor area of approximately 500 square feet, but all four of whose walls are interior walls. The room does not extend to the exterior wall on the south side of the building, leaving an apparently inexplicable 2 1/2 foot wide corridor between the south wall of the room and the exterior south wall of the building. The only rational explanation for this concept is to meet the requirement of a 50 foot distance from the south property line. Sure enough, the exterior wall of the existing building is clearly and obviously shown to be less than 50 feet from the property line.
The applicant's contention otherwise is inexplicable. While there may be no testimony on this point, the plan, as lawyers like to say, "speaks for itself." The hearing officer was clearly not mistaken.
On cross-examination, however, Mr. Slye testified:
 "In addition, I pointed out a change in our schedule(?) where we move the room to the outside wall to facilitate explosion, if any, which is required by NFPA 30." Transcript, July 18, 1989, p. 158.
It is disingenuous to argue that moving a room is a mere amplification or clarification of a design concept to demonstrate how that concept can or will conform to a predetermined standard. Moving this room is clearly a change of concept to meet the standard.
According to Mr. Slye:
 ". . . NFPA 30 requires that an outside wall and,
if possible(!), the roof be a light construction so that, if there's a spill and a delayed ignition of the flammable vapor within the room, . . . the wall will recede to relieve the pressure and allow the internal fire system and the internal building to be undamaged." Transcript, July 19, 1989, p. 23.
When he was asked whether such an explosion-venting wall could be installed in Container Storage Area 5 as conceived on Site Plan C, he answered somewhat evasively: "You could put an explosion-venting roof." Id., p. 24. He extended his response by testifying:
 "There cannot be a wall relieving inside the building as is shown on Site Plan C. If you remember, my mission was to clear the provisions of the application so that when they went to design, they would be in a better position to have the system better defined and clarified. And, I did that, as I testified yesterday and the day before yesterday, in Area 5 to property relieve that room to insure that we have full safety of the facility." Id., pp. 24-25.
The hearing officer graciously declined to accept the suggestion that the applicant's design team planned to comply with NFPA 30 by having the roof blow off. It is obvious that the requirements of NFPA 30 as subsumed in 40 CFR 264.31 do not readily adjust to the requirements of 40 CFR 264.176 in this facility as proposed because of the limited distances from the outside walls of the facility to the south and east property lines. This regulatory misfit is reflected in repeated public comments addressed to the relatively small size of the applicant's lot.
The size of the applicant's lot subjects it to a "Catch-22." The flammable liquid storage room, as designed, violates 40 CFR 264.31. If it is "adjusted", as proposed, it will violate 40 CFR 264.176. Either way, the hearing officer's finding is supported by substantial credible evidence that the proposed design will not comply with the Rules and Regulations.
2. The Loading/Unloading Bay
The hearing officer found that the hazardous waste recessed loading/unloading bay which is depicted conceptually in the southeast corner of the facility presented problems in conforming to 40 CFR 264.31.
She found specifically:
 "The design of the western wall of the eastern bay as proposed by the applicant in its permit application is flawed in that it does not minimize the possibility of a fire.
 The better engineering practice requires that the western wall of the eastern loading/unloading bay be adjusted to meet an N.F.P.A. 30 standard equivalency by strengthening the wall to provide fire separation.
 The addition of the solid western wall of the eastern bay eliminates the ramp access to Storage Area 4, (unless the wall is pierced with fire doors) and requires the use of a `grade level pad'.
 * * *
 The existing ramps are short and steep due to space limitations and are unacceptable in that they may contribute to the possibility of forklift tipping and increase the occasion of spills and the possibility of fire."
 Recommended Final Decision, pp. 92, 93.
All of these shortcomings, if uncorrected in the final design, would undoubtedly lead to the conclusion that the applicant had failed to "minimize the possibility of a fire [or] explosion," as required by 40 CFR 264.31. Each of these findings is supported by evidence provided by Mr. Slye, himself, who equated the minimizing of the possibility of fire or explosion with the complying with or exceeding the requirements of NFPA Code 30.
If Site Plan C is allowed to speak for itself, it depicts a concept of a loading and unloading bay within the exterior walls of the existing building. Mr. Slye testified:
 "I believe I testified that the area as shown on Site Plan C, the outside walls are generally, are what's going to remain as the footprint. To my knowledge, it's not going to be any different." Transcript, July 19, 1989, p. 109.
If the legend on site Plan C is accurate, the outside east wall of the bay is an exterior concrete wall with a twelve foot overhead door nearly at its northernmost end. The west wall of the bay is an interior concrete wall running parallel with and approximately twenty feet away from the outside wall and extending northerly into the building approximately forty-eight feet. This wall separates the bay from Container Storage Area 5. The northern end of the bay shows two ramps from the nonrecessed, or unloading dock portion of the bay, one to the north and another to the west, both sloping downward into Container Storage Area 4. Mr. Slye testified that he understood that in order to comply with NFPA 30, the lines which demark the tops of the ramps and the limit of the pump space are actually interior walls. He said:
 "The portion of the wall as shown on Site Plan C between the unloading and loading bay and Storage Area No. 5 has a concrete wall. The rest of it is not defined. However, we do say in the application that we will comply with NFPA 30. And, to comply with NFPA 30 that should be a separate fire area. And, that is why it is showed on the sketch, applicant's 43 for information (sic) as a fire wall." Transcript, July 18, 1989, p. 91.
On July 19, 1989 the witness marked in red and initialled on Site Plan C the lines which he considered to be walls, and which NFPA 30 required be fire walls. Transcript, July 19, 1989, p. 114. If the bay is separated from Storage Area 4 by a fire wall it becomes necessary to have a fire door in one of those walls to get from the unloading dock to the storage area. Mr. Slye testified:
 "So a fire door would be placed on the southwest corner of that platform in the wall that the actual forklift truck would be using. And, of course, the line on the north end would be part of the fire wall." Transcript, July 18, 1989, p. 98.
Of course, if he is correct, "a very busy configuration" is indeed presented. Ultimately, the witness suggested that, because of the foam/water sprinkler system, NFPA 30 could be satisfied even without fire walls at the north end of the loading bay.Id., p. 124. The hearing officer was justified in concluding that the west and north walls were not proposed as fire walls, and that the design concept presented in the application did not minimize the possibility of fire or explosion.
The applicant is undoubtedly correct in asserting that Mr. Slye's "clarifications" or "adjustments" improve the design of the facility so far as public health and safety are concerned. Of course, the permit process should encourage rather than discourage the enhancement of the fire and explosion safety features of a proposed facility. Even so, at some point, or at some level of description the hearing officer must decide whether the facility has been designed to minimize the risk.
Any confusion as to the design concept presented by Site Plan C with respect to the north end of the loading and unloading bay might have been cleared up if the applicant had called the engineer, Mr. Thomas J. Dolce, who signed and placed his seal on the drawing. Although the hearing officer did not draw any adverse inference from this failure, she could have, had she wished to do so.
In any event, even assuming Mr. Slye was correct in concluding "intuitively" (Transcript, July 19, 1989, p. 114) that the lines at the north end of the bay had to be walls, his alternative to an assumed fire door at the southwest corner of the loading platform was a two-door arrangement and a "grade level pad" on the east side of the building. As he described it:
 "Q. On the basis of what is depicted on Applicant's No. 43, could you tell me whether you have to go outside the facility to transfer containers from the `containment for tank truck' area (loading/unloading bay) to Fire Area No. 3 (container storage area 4)?
 A. That is depicted on the drawing. Yes.
 Q. So you have to go outside the building to move stuff from the tank truck area to the inside of the facility?
 A. When they're unleading by forklift truck, that is the plan. And, there are reasons for that in order to meet NFPA requirements. Also, for safe handling procedures with a forklift truck."
 Transcript, July 18, 1989, pp. 92-93. See also, Id., p. 99, 11. 2-4.
The witness originally seemed to be confused as to the configuration of the ramp from the loading platform to container storage area 4. He seemed initially to believe that the ramp sloped down from the platform to the east outside the overhead door. Eventually, he made out that the ramp sloped down from the platform to the west inside the storage area. Transcript, July19, 1989, pp. 115-118, 121. In his testimony he said: ". . . forklift trucks are going to have a hard time making that change (?) down the bottom there." Id., p. 116.
Even a cursory examination of Site Plan C shows that the ramp from the loading platform is as long as, and slopes at the same rate as all the other ramps in the container storage areas, which are shown in detail A-A' on the plan. This ramp is considerably wider than the ramps from one storage area to another but is no steeper. The witness did testify in explaining his "in-and-out-the-building" method of unloading hazardous waste containers that:
 "We felt in our proposing in 43 that this is a safer arrangement because you have a longer ramp, so you don't have the possibility as much of tipping the forklift truck as you would with a steep ramp." Transcript, August 1, 1989, p. 102.
This Court cannot accept the witness' testimony about the steepness, size or direction of slope of the ramps as reliable, probative or substantial evidence, considering the whole record, on which to base a factual finding. Accordingly, the hearing officer's findings regarding the existing ramps, or the ramps proposed in the application are clearly erroneous and may not be the basis for the conclusion that the design does not minimize the risk of fire or explosion.
The hearing officer made several findings of fact adverse to the applicant regarding the suggestion by Mr. Slye that an outdoor grade level pad be used to route forklift trucks out one door from the indoor unloading platform in another door, to the indoor container storage area. She found:
 "The grade level pad is designed to extend eastward from the eastern footprint of the unloading area towards the eastern property line.
 The dimensions of the grade level pad have not yet been determined.
 The distance of the pad from the far eastern boundary to the next property line has not yet been defined.
 The turning radius of the pad is not yet defined.
 The utilization of the grade level pad requires a forklift truck with drums of hazardous waste to travel from inside the bay to the pad located outdoors, then take a U-turn and travel back inside to Storage Area 4 for temporary storage, sampling and classification."
 Recommended Final Decision, p. 93.
These findings accurately summarize Mr. Slye's testimony which described the proposed pad. See Transcript, August 1, 1989, pp. 100-03, 107.
The hearing officer also found with regard to the proposed grade level pad, which is really nothing more or less than an outdoor paved turning area:
 "The design of the grade level pad lacks specificity, and does not provide sufficient detail to conduct a meaningful review. As presently designed it is flawed." Id.
While the finding that the design lacked sufficient specificity to permit a meaningful review is inconsistent with the finding that the design is flawed, the Court understands the hearing officer to mean that she rejects the concept of an outdoor turning area as a means of solving the problem of compliance with NFPA 30 by a fire wall surrounding the loading and unloading bay. In that light her next finding clarifies her conclusion:
 "The elimination of the grade level pad would require the utilization of fire doors piercing the solid western wall of the eastern loading/unloading bay with access to Storage Area 4 by the existing ramps." Id.
As in the container storage area and the flammable liquid storage room it is the use of an already existing structure on a lot of relatively small size which creates the design problems. Each suggested solution serves to create new problems. If the lot were big enough, the unloading bay and pumps could be safely located in a free-standing structure, properly constructed the required safe distances from other structures with appropriate fire walls and explosion venting features, together with appropriate fugitive emission capture procedures as well as spill prevention and containment. True, forklift trucks might run outdoors, but they would not be required to engage in the transport minuet suggested by Mr. Slye. Even though the hearing officer didn't say so directly, it is clear from all the evidence that Mr. Slye's alternative is a patent makeshift.
In sum then, as with the flammable liquid storage room, the evidence fails to prove that the unloading area, both as designed and conceived on October 13, 1987 and as modified, clarified and improved in July 1989, has been designed to minimize the risk of fire or explosion. This Court cannot find that the hearing officer's findings were clearly erroneous.
C.
40 C.F.R. § 264.343(a)
The hearing officer concluded that:
 "The Applicant has failed to prove that the proposed incinerator has been designed to achieve the operating conditions required for Destruction Removal Efficiency of 99.99% or of 99. 9999% pursuant to 40 C.F.R. § 264.343(a)(1) and 40 C.F.R. § 264.343(a)(2)." Id., p. 92.
Rule 11.01 B of the Rules and Regulations provides as follows:
 "The owner or operator of incinerator facilities must design, operate and maintain them so that when operating they will achieve the destruction and removal efficiency and performance identified in 40 CFR 264.343, as is or as amended."
 40 C.F.R. § 264.343 reads in pertinent part:
 "An incinerator burning hazardous waste must be designed, constructed, and maintained so that, when operated in accordance with operating requirements specified under § 264.345, it will meet the following performance standards:
 (a)(1) Except as provided in paragraph (a)(2) of this section, an incinerator burning hazardous waste must achieve a destruction and removal efficiency (DRE) of 99.99% for each principal organic hazardous constituent (POHC) designated . . . in its permit for each waste feed.
 * * *
 (2) An incinerator burning hazardous wastes F020, F021, F022, F023, F026, or F027 must achieve a destruction and removal efficiency (DRE) of 99. 9999% for each principal organic hazardous constituent (POHC) designated (under § 264.342) in its permit".
This requirement of a minimum destruction and removal efficiency goes to the very essence of the purpose of incineration as a means of treating organic hazardous wastes. The expert witnesses all agreed with common knowledge that organic compounds consist of molecules which contain carbon. Organic compounds may, of course, contain many other elements, including metals, in a myriad of combinations.
Incineration destroys and removes organic hazardous constituents from a waste stream by oxidizing these constituents. For a layperson "oxidize" is a fancy word for burn, just as "incinerate" is. The organic hazardous constituent is exposed in an incinerator to atmospheric oxygen at an appropriate high temperature, so that its molecules are broken down into a combination of non-hazardous substances, like carbon dioxide and water vapor, and other hazardous substances, which must be removed from the exhaust stream by other methods of control. These other hazardous substances may include hydrogen chloride (hydrochloric acid, when dissolved in water), elemental metals in gaseous or vapor form (such as mercury), as well as metallic compounds. The important point is that the essential function of the incinerator is to destroy and remove organic hazardous waste constituents from the waste streams.
Since no device designed by human minds achieves perfect performance the regulations prescribe a minimum standard. For principal organic hazardous constituents (POHC's) in the waste stream the incinerator must be designed to destroy and remove at least 99.99% (four nines) by mass of that constituent from the stream entering the incinerator. For certain highly hazardous chlorinated organic constituents such as polychlorophenols (PCP's) and polychlorobenzenes (PCB's), the standard of acceptable destruction and removal efficiency is raised to 99. 9999% (six nines). Although the applicant disaffirmed any intention to incinerate wastes requiring the heightened DRE, the applicant plainly scheduled such wastes for incineration at page 3B of 5 of its EPA Form 3, Hazardous Waste Permit Application, which it included as Appendix A to this application. Since the hearing officer denied the application on the ground that the applicant had failed to prove the incinerator would achieve a DRE of four nines, the question of whether it was required to achieve six nines is moot.
The incinerator design is displayed graphically in Applicant's Exhibit 2 at pages 12 thru 16, inclusive. Page 14 demonstrates the primary element of the incinerator, the conoid rotary kiln, in which the applicant estimates 99% of organics will be destroyed. In Applicant's exhibit 13, the written evaluation by Mr. Robert J. McCormick of the proposed incinerator, the kiln is described at page 7 in part as follows:
 "The most unusual feature of the ISI kiln is its pseudoconical, four-section construction, with the internal diameter increasing (in 18-in increments) from 4.5 ft at the ash-discharge end to 9 ft at the gas-discharge end. By comparison, a conventional kiln is cylindrical with the same internal diameter throughout its length.
 The conical design has an apparent process advantage with respect to ash carryover in the kiln exit gas stream. The gas velocity through the enlarged end of this kiln is approximately 40 percent lower than for a conventional cylindrical kiln with the same volumetric heat release rate. There are no apparent disadvantages to this design other than higher material and fabrication costs."
Mr. McCormick's credentials as an expert in the evaluation of the design of hazardous waste incinerators are beyond question. He literally "wrote the book" on hazardous waste incineration engineering for the U.S. Environmental Protection Agency. SeeApplicant's Exhibit 12. This exhibit is clearly the source for the pertinent portions of City of Warwick's Exhibit 10, EPAEngineering Handbook for Hazardous Waste Incineration. Cf. pp. 113-14 of Applicant's 12 with pp. 4-32 thru 4-34 of City's 10.
Apparently the hearing officer had no problem in accepting the applicant's representation that the first two nines of destruction and removal efficiency would be achieved in the rotary kiln. The design of the after-burner or secondary combustion chamber was found to fail the requisite standard of proof that it could achieve a destruction and removal efficiency of the remaining two or four nines required by the State and Federal rules and regulations.
The after-burner, or secondary combustion chamber is graphically displayed at page 16 of Applicant's Exhibit 2. A more precise rendering of the combustion package is shown in an engineering drawing captioned, "Mod #LPSS-ZOOH Rotary Cone Incinerator for Hazardous Waste — Solids, Liquids, Sludges," drawn by J. Lobik, who is identified in the testimony as having extensive experience in the design of industrial incinerators.
The secondary combustion chamber is described by Mr. McCormick in Applicant's exhibit 13 at pages 7 and 8 as follows:
 "The proposed ISI afterburner is a horizontal trapezoidal chamber designed to be installed directly above the kiln without occupying additional floor space. The interior of the chamber is 10 ft wide and 27 ft long with the height increasing from 7 ft to 12 ft. Kiln gas enters at the bottom of the smaller end of the chamber where it passes perpendicular to and through the flames of two opposite-fired, sidewall-mounted burners as the gas turns from a vertical to a horizontal flow path. The combined combustion gases exit through the larger end of the chamber.
 The trapezoidal configuration of this unit and the use of dual, opposed burners to promote kiln gas/burner gas mixing are not common design features. Most horizontal kiln afterburners are cylindrical with axially-fired burners and either radial (tangential) or bottom kiln gas entry. The SCC design is also unusual with respect to gas velocity and residence time, which are discussed later in this section.
 DRE does not predict any distinct performance advantage or disadvantage with the ISI afterburner design approach. The apparent advantage of the ISI design is the reduction in floor space required for installation. The apparent disadvantage is higher material costs for chamber construction."
At page 8 of the exhibit, Mr. McCormick says:
 "The proposed combustion system operating conditions for the FBI facility are as follows:
 1200-1800 F gas temperature in kiln 2250 F gas temperature in SCC 4+ sec gas residence time in SCC 50 percent excess air (7.0-7.5 percent 0[2]) in SCC exit gas
 Based on DRE's experience, these operating conditions will provide [more than] 99.99 percent destruction of all RCRA organic wastes. These operating conditions will, in all probability, provide [more than] 99. 9999 percent destruction of all organics."
Mr. McCormick appeared at the hearings and testified on four days. He was subjected to extensive and searching cross-examination, but his opinion was unshaken. Nevertheless, the hearing officer rejected his conclusion. She relied on the testimony of the City of Warwick's witness, Mr. Boyd T. Riley, Jr., as well as inferences she drew herself from Applicant's Exhibit 12.
Mr. Riley earned a Ph.D. degree in environmental engineering from the University of Florida in 1966. He then joined the United States Public Health Service as a researcher in its solid waste research program. He eventually became a budget officer and director of the research program of the U.S. Environmental Protection Agency until 1972. Then he became a self-employed consultant working for three years as a contractor with the City of Cincinnati and the EPA on the City's full-scale hazardous waste incinerator. He has had extensive hands-on experience with the hazardous waste incinerator operated by the City of Cincinnati, which he described as five times larger than the one proposed by the applicant. He has worked on or evaluated a couple dozen incinerators. Without objection he was accepted as an expert witness in the design and engineering of hazardous waste incinerators.
When asked about standard retention time for the gaseous hazardous waste stream in the secondary combustion chamber, he testified:
 "The normal retention time use(d) . . . for minimum design expectation is two seconds in a secondary combustion chamber." Transcript, May 24, 1989, p. 60.
He then testified that he knew that the applicant had calculated a retention time estimated to be in excess of two seconds. Id.See also, Joint Exhibit 13, p. 11-27. The significance of retention time, he testified, is that it "is basically an empirical measure for assuring that there is adequate time for the reactions to go to completion." Id., p. 61. The witness is obviously referring to the oxidations which "destroy" the organic hazardous waste constituents left in the gas emerging from the kiln. He emphatically did not agree that the nominal retention time of the gas stream in the chamber would be as long as 4.1 seconds, as calculated by Mr. McCormick, and went on to opine unequivocally that even the two second standard would not be achieved. Id., p. 64. He attributed his opinion to the unique configuration of the chamber itself:
 "The designed shape of the secondary combustion chamber is pie-shaped or pyramid-shaped lying on its side with the entry points consisting of some burners where liquid waste are burned and gases that enter into one side of the chamber.
 The exit point from the chamber is at the lower part of the chamber and on one side and consists of a 4 foot diameter duct, ultimately leading through the air pollution equipment to the induced draft fan and in short, all movement through the system is produced by sucking on the system by the fan.
 In this case, essentially, all of the gas flow is going to pass directly from the burners and entry point to the exit duct without benefit of using the majority of the secondary combustion chamber because it's more or less off to one side of the primary flow path." Id., pp. 64-5.
Finally, he calculated the retention time would actually range between three-quarters to maybe one second. Id., p. 66. The formula used by Mr. McCormick, he suggested, was appropriate only for combustion chambers in a typical lengthened cylindrical shape without significant opportunity for the gas stream to short-circuit portions of the chamber volume. Id., pp. 71-73.
The witness referred to City's Exhibit 10 as a basis for his calculation of retention time using only a portion of the total volume of the combustion chamber. It was his opinion that there would be significant channelling in the chamber as designed.Id., p. 80.
The applicant argues that the witness' ultimate conclusion that the combustion chamber would not achieve the predicted destruction and removal efficiency is not asserted with sufficient testimonial assurance. The argument is based on a niggardly reading of the witness' testimony.
 "Q. And what effect, if any, could a reduced retention time in the secondary combustion chamber have on emissions?
 A. It's conceivable that this would cause less than the desired amount of completion in the combustion reactions.
 MR. SPRAGUE: I have no further questions.
 THE HEARING OFFICER: Could you expound on that a little bit further, Dr. Riley, Please.
 THE WITNESS: Yes, retention time is a relatively difficult measurement to make. So, what's normally done is you take the chamber volume and assume that that's going to represent retention time based on given gas flow through the chamber. If that is substantially the case, and you estimate a retention time of, let's say the retention time is two seconds, which is the normally used figure used by EPA in their estimates, that's what one would expect to have as a minimum acceptable retention time. If you achieve that, then you reasonably expect to achieve the degree of completeness of combustion that you would expect to four nines destruction. As you reduce that time, the probability of not achieving the desired degree of combustion completeness goes up.
 THE HEARING OFFICER: And have you formed an opinion in that regard with respect to this proposed facility?
 THE WITNESS: I think that the reactions in the combustion system are so complex that it is difficult to form an out-of-pocket estimate of what the real effect is going to be. That's the reason an empirical approach is normally used to come up with a retention time.
 We've built things that have a two-second retention time and they work. That's sort of the way, the overall approach that governs the engineering world." Id. pp. 80-81 (Emphasis supplied)
The hearing officer was satisfied, as is this Court, that the witness was predicting performance with a reasonable degree of engineering certainty. He stated the factual basis for his conclusion: combustion chambers with a two second retention time achieve the desired DRE. If that retention time is reduced the probability of not achieving the required DRE goes up. His opinion is stated with a reasonable degree of certainty in terms of probability. Cf., Cobe v. Hersey, 576 A.2d 1226 (R.I. 1990).
Even if Mr. Riley's opinion as to an expected DRE is not sufficiently definitive, and has not been asserted with the assuredness one might legalistically expect, his predicted retention time of one second or less certainly is. Mr. McCormick's evidence is replete with references to a "conservative" retention time of 4.1 seconds in the secondary combustion chamber. His ultimate conclusion as to the predicted DRE of this incinerator depends on a retention time of at least two seconds. The hearing officer was fully justified in accepting Mr. Riley's prediction as to retention time, and rejecting Mr. McCormick's. Kargman v. Jacobs, 113 R.I. 696, 702,325 A.2d 543, 546 (1974) If she was justified in rejecting one of the essential factual bases for Mr. McCormick's conclusion, she was justified in rejecting his conclusion.
The applicant has the burden of proof. With Mr. McCormick's opinion rejected, and Mr. Wynn's being patently worthless, since he never designed or evaluated a hazardous waste incinerator, there is no reliable proof in the record that the incinerator would achieve a 99.99% DRE. Accordingly, the hearing officer was not clearly erroneous in finding that the applicant had failed to satisfy its burden of proof that the incinerator was designed to achieve a destruction and removal efficiency of 99.99% as required by 40 CFR 264.343(a)(1) or 99. 9999% as required by CFR 40 264.343(a)(2), if it incinerated certain poly-chlorinated waste constituents.
IV.
Accordingly, the decision of the acting Director is affirmed. The plaintiff's appeal is denied and dismissed. The defendants may have judgment for their costs. The defendants will present a form of judgment to be entered on notice to the plaintiff.